IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CHRISTEN WADDLE | ) | CLERKS OFFICE U.S. DIST. COURT AT DANVILLE, VA FILED |
| Plaintiff | ) ) | **DEC 13 2018** |
| | ) | JULIA C. DUDLEY, CLERK |
| v. | ) ) | BY: s/ MARTHA L. HUPP |
| Aundrea Claughton | ) | DEPUTY CLERK |
| | ) ) | Case No. 4:18-cv-00010 |
| Todd Moser | ) ) | |
| Nicholas D. Jones | ) | |
| 1074 Pine Height Trail | ) | |
| Halifax, VA  24558 | ) ) | |
| | ) | |
| Dre D. Tucker | ) | |
| 1066 River Road | ) | |
| South Boston, VA  24592 | ) ) | |
| Defendants | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Christen Waddle ("Waddle") files this First Amended Complaint against Aundrea Claughton ("Claughton"), Todd Moser ("Moser"), Nicolas D. Jones ("Jones"), and Dre D. Tucker ("Tucker"), and in support thereof states as follows:

<u>JURISDICTION AND VENUE</u>

1.     Jurisdiction for the claims set forth in this Complaint is conferred pursuant to 28 U.S.C. § 1331 and § 1367(a).

2.     Venue is proper for this action, which arose in Halifax County, Virginia, and involves defendant residents of Halifax County, Virginia, pursuant to 28 U.S.C. § 1391.


WOODS ROGERS PLC
ATTORNEYS AT LAW

## STATEMENT OF FACTS

3.      Waddle is a Virginia resident with her current place of residence Halifax County, Virginia.

4.      Claughton, Moser, Jones, and Tucker are residents of Halifax County, Virginia.

5.      At all times relevant to this Complaint, Moser was the "chief animal control officer" for Halifax County, and Claughton was an "assistant animal control officer" for Halifax County.

6.      Pursuant to Virginia Code § 3.2-6555, each county under state law must:

> [E]mploy an officer to be known as the animal control officer who shall have the power to enforce this chapter, all ordinances enacted pursuant to this chapter and all laws for the protection of domestic animals… Animal control officers and deputy animal control officers shall have knowledge of the animal control and protection laws of the Commonwealth that they are required to enforce. When in uniform or upon displaying a badge or other credentials of office, animal control officers and deputy animal control officers shall have the power to issue a summons or obtain a felony warrant….

7.      According to Virginia Code § 19.2-71, only law enforcement officers and animal control officers are authorized to secure a felony arrest warrant without prior approval of the local commonwealth attorney or the law-enforcement agency having jurisdiction over the offense.

8.      On the morning of December 20, 2017, Waddle was traveling by car along State Route 360 near Union Church Road in Halifax County, Virginia. She was headed to the grocery store to pick up some needed things quickly.  She had to be back to her home soon because her two children would be arriving by school bus as a result of an early dismissal starting the Christmas Holiday break.

WOODS ROGERS PLC
ATTORNEYS AT LAW

2

9.      While driving, Waddle unexpectedly encountered a dog standing in the middle of the road on State Route 360.  Waddle had to swerve dramatically to avoid hitting the dog.  She observed that the vehicle behind her likewise had to take evasive action to avoid hitting the dog.

10.      Waddle turned around her vehicle and returned to where she had encountered the dog.  She found the dog lethargic and shaking.  Its ribs were visible and it had obvious facial scratches.  Waddle could see immediately that the dog was emaciated, was sick, and had not been properly cared for by its owner.

11.      At 10:01 a.m, on December 20, Waddle called from her call the Halifax County Sheriff's Office by cell phone and asked to speak with someone in Animal Control.  Her call was put through, but there was no answer.

12.      Waddle got out of her car to inspect the dog.  She noticed the dog was wearing a tracking collar, and an identification collar that had Jones's name and a phone number on it.  At 10:05 a.m., Waddle called that number, but there was no answer.

13.      While Waddle was placing the call, the dog moved over to the front driver side door that Waddle had left open when she got out of her car to get the owner information. With obviously labored effort, the dog managed to paw its way into the front driver-side floorboard. Waddle moved the dog to the back seat, where it remained passive.

14.      Despite having little time before her children's school bus arrived at her home, Waddle decided to take the dog to Animal Control where it could be properly evaluated and a determination made about the dog's deplorable physical condition and what should be done about it.

WOODS ROGERS PLC
ATTORNEYS AT LAW

15.      Waddle located Jones's Facebook page on her cell phone and left him a message at 10:08 a.m.  She stated that she had one of his "hunting dogs" and that if he wanted the dog

back he could meet her at "Animal Control." She added that the dog was shaking and was starved and described the dog's condition as "pathetic."

16.     Waddle had noticed when she started her trip that morning that her gas light was on and she would soon need gas. She accordingly decided to drive to the "Spirit" gas station at the intersection of Halifax Road and Greens Folly Road to get gas before continuing her drive to Animal Control.

17.     Unknown to Waddle, Tucker and Jones, and others in their "hunt club" had been deer hunting on the morning of December 20, 2017. According to Tucker's deposition testimony, he had been situated on a deer stand approximately a mile away from the road where Waddle found the dog, with Jones "in the bushes" driving dogs toward the stand.

18.     According to Tucker, prior to Waddle beginning her drive to Animal Control, Tucker had ceased the hunt and was in his truck, using his GPS device, to track down and pick up the dog near "the church." Jones in his deposition testified that prior to trying to locate the dog Waddle befriended, the hunters had already secured the other two dogs Jones had released from his house that morning, and those dogs were already on the back of Tucker's truck.

19.     Tucker had previously observed that the dog Waddle befriended had not crossed the road like the other two dogs that were involved in the hunt. While in route to pick up the dog, Tucker noticed that the dog had left the road location near the church, where it had been previously situated, and was now traveling at "50 mph." Tucker and those who had been hunting with him, and were in his truck with him, began to follow the course of the dog by GPS guidance. That led them to the gas station where Waddle had gone to purchase gas.

20.     While Waddle was standing at the station's gas pump, she saw a pickup truck with dog kennels and two dogs in the back race by the gas station. The truck was Tucker's. The

truck turned around abruptly and speeded toward the station.  Waddle became concerned for her safety so at 10:16 a.m. she phoned 911 as the truck came on the lot and before any words were exchanged with any of the truck's occupants.  The truck came to a stop on the passenger side of Waddle's car.  Five men exited the pickup truck and surrounded Waddle's car. As they did so, Waddle locked the car.

21.     As Waddle spoke with the 911 dispatcher, Jones asked Waddle if she had his dog. Knowing Jones by sight, she responded that she did, that she had the "law" on the phone, and that "they are going to meet us here."

22.     The five men, including Jones and Tucker, continued to surround Waddle's car. They began calling her a vulgar name and threatening to break her car windows if she didn't immediately turn over the dog. In response, Waddle repeated that the "law is on their way."  She reported to the dispatcher, who was on her cell phone line, that the dog was "starved to death," its face was scratched up, and it was scared to death.  She urged the dispatcher to send someone. The whole time Waddle spoke with the dispatcher, the men, including Jones, continued to aggressively shout vulgar statements and threats at her.

23.     For his part, Tucker testified in his deposition that he did not engage in the threatening behavior against Waddle, like the others, and in fact upon hearing from her that she had called the law, told her that he was fine in waiting for the law to arrive.

24.     Jones likewise testified in his deposition that he heard Waddle say that the law was on its way, but it was his intent to compel Waddle to give him the dog before the police arrived so as to avoid any problems with the police.  As he admitted in his deposition, Jones at the time was motivated by the desire to get his dog and get away from the station before the police arrived, explaining that "I don't want no [sic] law on me."

Woods Rogers PLC
ATTORNEYS AT LAW

25.     The dispatcher instructed Waddle to get into her car and lock the door.  Waddle expressed concern that if she unlocked her doors, the men would take the dog and, given the dog's marked debilitated condition, she told the dispatcher that she was not going to allow that to happen before the law arrived. The dispatcher instructed Waddle to stay on the line with him.

26.     The dispatcher asked what the men were trying to do, and Waddle said that she guessed that they were trying to get the dog, but that she was not giving the dog back to them. She told the dispatcher about having called Halifax County (only minutes earlier) and being transferred to the "pound," but that nobody with Animal Control answered (a statement Waddle's cell phone records confirms).

27.     Waddle also informed the dispatcher that she had retrieved the dog and was driving it to Animal Control and had stopped to get needed gas. She confirmed to the dispatcher that the dog belonged to "them," but that the dog was starved.  She asked the dispatcher to have Animal Control come to the scene. The dispatcher confirmed that he was trying to arrange for that to occur.

28.     The whole time Waddle spoke with the dispatcher, the men surrounding her continued to curse her in loud threatening voices and stated that they were going to bust out her car windows.

29.     As a Halifax sheriff deputy, Crystal Yeatts, drove up to the gas station in response to the 911 dispatcher's instructions, Waddle commented to the dispatcher that the truck was leaving, which suggested "something is up" to cause such an obvious evasive action prompted merely by the arrival of the police on the scene.  While Tucker's pickup truck abruptly and inexplicably left the scene, Jones and Tucker remained.  Discovery in the case has confirmed that

another of the men with Jones and Tucker drove Tucker's truck away as Deputy Yeatts arrived

with at least two of Jones's dogs, without proper licensure, in the back.

30.     Waddle reported to the dispatcher that the men had stated that the dog in her

possession "has been missing a while" (as if that would excuse the emaciated state of the dog).

Discovery in the case has confirmed that Jones is the person on the 911 tape making that

statement, and that the dog had, in fact, been missing for a couple of weeks prior to December

20.

31.     The dispatcher then called Claughton and relayed that Waddle had picked up what

looked like a hunting dog that she had almost hit, that the dog looked malnourished, that she had

stopped to get gas on her way to the pound when individuals pulled up in a truck, and that the

individuals owned the dog but she would not let them have it.  Claughton responded "10-4" in

response to the dispatcher's short summary of these facts to confirm he had received the

message.

32.     Claughton then arrived at the gas station. Waddle immediately opened up the

back door of her car to provide Claughton access. Claughton picked up the dog and stated to both

Waddle and Jones that "I'm taking this dog with me; he is starved and underweight."

33.     According to Jones, Claughton responded to his question about whether Jones

would get the dog back with "we'll have to see."

34.     After seizing the dog, Claughton left the scene for Animal Control without

engaging Waddle, Jones, or Tucker in any substantive discussion about the prior events of the

day.

WOODS ROGERS PLC
ATTORNEYS AT LAW

35.     At no time did Waddle in anyway resist any request by Deputy Sheriff Yeatts or

Claughton at the station.  In fact, Claughton's taking custody of the dog was precisely the result

she had been seeking, as stated on Facebook and to the 911 dispatcher, since almost hitting it in the middle of State Route 360 minutes before.

36.    Claughton's taking of possession of the dog rather than returning it immediately to Jones, and thereafter arranging for its intake and evaluation at Animal Control (which included a finding of violation of the cruelty statute, Virginia Code § 3.2-6570), constituted a "seizure" under Virginia law, which precluded Claughton from rightfully returning the dog to Jones without a judicial order pursuant to Virginia Code § 3.2-6569.

37.    Claughton took the dog to the Animal Control office where it was inspected by an "A. Conner," apparently another assistant animal control officer.  Conner rated the dog a "3" on the Purina Body Condition System which represented a finding that the dog's

> [R]ibs were easily palpated and may be visible with palpable fat.
> Tops of lumbar vertebrae visible.  Pelvic bones becoming
> prominent.  Obvious waits [sic] and abdominal tuck.

38.    According to Conner's report, Jones was directed to take the dog "to vet for evaluation within 24 hours."  Claughton released the dog to Jones at 11:00 a.m. on December 20, 2017, in violation of Virginia Code § 3.2-6569.

39.    According to Claughton, while Connor was processing the dog, he prepared an initial report.  He wrote that he had received a call from 911

> advising that Christine Waddle had a dog in her car that she
> wanted to hand over to Animal Control and was at the Valero in
> Centerville 5005 Halifax Rd South Boston.  Christine Waddle
> unlocked her vehicle and the dog was laying in the back of her
> vehicle on the driver's side.  The owner of the dog and Christine
> Waddle started arguing about the dog.  The owner was just telling
> her that he wanted his dog back and she wouldn't let him have the
> dog back.  I told Nick Jones and Dre Tucker that the dog was
> going with me and that they could pick the dog up from Animal
> Control.  They agreed.  I then told Christine Waddle that the dog
> was going with me to Animal Control. Christen Waddle was fine
> with that.

Woods Rogers PLC
ATTORNEYS AT LAW

40. Tellingly, Claughton withheld from this first version of his report what the dispatcher had told him about Waddle having almost hit the dog, finding it malnourished, and being in the process of taking the dog to Animal Control when she was confronted by Jones and others at the station. Claughton also left out of his version that he had acknowledged the dog's poor physical condition to Waddle and that in his statement to Jones he had reserved judgment on whether Jones would get the dog back.

41. But even Claughton's misleading written statement included enough to show that Waddle was not attempting to steal the dog, but instead wanted to turn the dog over to Animal Control, and that there had been absolutely no resistance on her part in turning over the dog to him upon his arrival (at her request) at the station.

42. At 12:51 p.m. on December 20, 2017, Jones responded to the Facebook post Waddle had posted before the gas station confrontation informing him that she was taking the dog to the pound. He wrote (vulgarity omitted and noted by …):

> U thought the dog man was gonna take my dog he said u were …
> dumb for calling him it's a … hunting dog when u left the cop and
> animal control called u stupid and they gave me my dog back u …
> dummy.

43. Jones in his deposition stated that he had lied in his Facebook posting about the statements he attributed to Deputy Yeatts and Claughton.

44. Waddle was rightfully stunned to learn from Jones's Facebook post that Animal Control would release the dog back to the owner, given its obvious mistreated state under Jones's prior care. She called Animal Control and spoke to Claughton at 12:59 p.m. on December 20, 2017.

WOODS ROGERS PLC
ATTORNEYS AT LAW

45.     In that conversation, Claughton confirmed that the dog had been returned to the owner and added that he had no choice but to return the emaciated dog because it "belonged to a hunting pack."

46.     Waddle told Claughton during the phone call that it was wrong for him to return the dog because it "belonged to a hunting pack" after taking the dog into custody due to its weakened state.  She said she was not going to let this go, and that she would be reporting him to the "highest authority possible" for his dereliction of duty.

47.     Immediately after speaking with Claughton, Waddle called PETA to report the incident and Claughton's failure to protect the dog.  As she had made clear to Claughton moments before, she was fully prepared to do whatever she could to expose Claughton's disregard of his duty to protect animals, including even "hunting dogs", from cruelty.

48.     Until Waddle criticized Claughton's actions and informed him of her intent to exercise her First Amendment rights to bring his actions to public attention, there had been no thought given or action taken to retaliate against Waddle, or otherwise subject her to wrongful abuse, for her humane action in trying to get the dog to Animal Control for its protection.

49.     But Waddle's criticism of Claughton for his dereliction of duty, plus the revelation that Claughton would now be subject to critical public exposure through Waddle's exercise of her free speech rights, motivated Claughton to embark on a course of retaliation against her for the purpose of shifting his own neglect to her and chilling her First Amendment free-speech rights.

50.     Jones would later state publicly that once Tucker had his tracking collar back and Jones his dog back (at 11:00 a.m. on December 20), both of them expected the matter to drop.

WOODS ROGERS PLC
ATTORNEYS AT LAW

Jones, in fact, expressly denied asking Animal Control to press charges against Waddle, stating to the news media that

> I didn't charge her and I [sic] doesn't matter to me.  Once I got my dog and collar back we were done.  We had nothing to talk about after that.

51.     But while Jones and Tucker had no intent to press bogus charges against Waddle, Claughton, now having been chastised and threatened with public exposure for his wrongful conduct, had other ideas.

**52.**     Promptly after receiving Waddle's 12:59 p.m. call, Claughton contacted Moser by a cell phone text message at 1:08 p.m.  **Claughton in his deposition (given before Verizon Wireless produced Claughton's text message records) falsely testified under oath that there had been no such text message exchanges with Moser on December 20, when, in fact, the 1:08 p.m. text was the first of a number that day.**

53.     Moser responded with a phone call to Claughton at 1:09 p.m., which lasted eight minutes.  Thereafter, Moser and Claughton conferred by cell phone at 1:21 for 3 minutes; and at 1:32 p.m. for five minutes.  Moser also sent Claughton a text at 1:30 p.m.

54.     Both Moser and Claughton would in early discovery in this case conceal that these initial communications took place and offer a false alternative version of their initial communications.

55.     Moser in the discovery response he provided, after a court order compelling the response, stated that Claughton initially called him while he was on vacation and that because the connection was poor he called Claughton back on a landline.

56.     Moser was subsequently required by a follow up court order to disclose his Verizon cell phone records for December 20 with Claughton.  Those records, as summarized above, confirmed that his sworn interrogatory response was untrue.

WOODS ROGERS PLC
ATTORNEYS AT LAW

57.     Later when confronted with his cell phone records in his deposition, Moser changed his story to state that he had told his counsel that he was unsure whether he had used a landline to return Claughton's call or had waited until he had better cell phone service to return the call.  His testimony if not rebutted would have indicated that his counsel had prepared an interrogatory answer contrary to the version he had related.

58.     But as stated above, even Moser's deposition version, which blamed his counsel for not reporting his version accurately, was untrue.  There had been no initial call from Claughton followed up by a return call from Moser, by either landline or cell phone.  There had instead been a text message, never disclosed until Claughton's cell phone records were secured from Verizon, to which Moser immediately responded by his eight-minute cell phone call to Claughton, followed up by numerous phone calls and text messages during the course of the afternoon up to the procurement of the arrest warrants against Waddle.  If not for the compelled disclosure of the Verizon cell phone records, Moser's false statements about his limited involvement in the decision to have Waddle arrested would have stood unrebutted.

59.     The falsity of Moser's disclosures about the nature and timing of his communications with Claughton was extended to his sworn version of what was related during those calls.  Moser's first description in discovery, compelled by court order, was of a single communication in which he instructed Claughton "to have Jones and Tucker give him statements, and then take those to the magistrate, who would determine if any criminal charges should be filed against the Plaintiff."  Moser described in that discovery no information whatsoever provided to him to justify such direction.

60.     Moser would later expand his interrogatory answer to describe a single communication with Claughton on December 20 in which he learned little about the incident involving Waddle:

> Moser remembers being called by Officer Claughton on December 20, 2017, while he (Moser) was on vacation.  Since the connection was poor, Moser called Claughton back on a landline and remembers being told that a woman had picked up a dog from the side of the road, a problem ensued between the woman and the owner of the dog and the collar on the dog and that Claughton intervened.  Claughton said he had gotten the dog and then turned it over to the owner sometime later.  Moser told Claughton to get statements from the owner of the dog and/or the owner of the collar concerning the incident involving the woman and to take those statements to the Magistrate to see if the situation warranted any type of charge.

61.     The falsehoods advanced by Moser and Claughton regarding their limited communication and lack of ongoing phone and text message communications, when in fact they were intensively involved in phone and text communications during the entire afternoon of December 20, demonstrates that, contrary to their sworn testimony in interrogatories and depositions, they were engaged within eight minutes of Waddle's confrontational call to Claughton in a scheme, which would include Jones and Tucker, to retaliate against Waddle and chill her First Amendment speech rights.

62.     Nothing in what Moser reports to have been told by Claughton in their single communication would provide either Moser or Claughton probable cause to believe a crime had been committed.  If Moser were to be believed in his compelled discovery response, then neither he nor Claughton had any reasonable basis to conclude that probable cause existed to initiate an arrest for any crime.

63.     Moser and Claughton in all their interrogatory and deposition sworn statements continued to advance the position that neither knew if a crime had been committed and were

WOODS ROGERS PLC
ATTORNEYS AT LAW

looking to the magistrate to make that initial evaluation.  Moser's and Claughton's very effort to disavow a duty to make the proximate cause decision themselves, before approaching the magistrate, confirms that they had no intent of fulfilling, and admittedly did not fulfill, their constitutional duty to make a reasonable proximate cause evaluation on their own before seeking a warrant.

64.     Not only did Claughton and Moser admittedly have no proximate cause to seek Waddle's arrest, they, in fact, intended to secure misleading statements so that they could present to the magistrate a false basis for larceny charges against Waddle.

65.     At 1:35 p.m. on December 20, after his repeated communications with Moser, initiated only after Waddle's critical phone call, Claughton called Jones on his cell phone.

66.     In his deposition, Jones testified that Claughton explained during that 1:35 p.m. call that because of something Waddle had done "**it got too deep**."  Claughton asked Jones to "**make a statement because she had went some over top of him, try to get him fired or something**."

67.     Based on Claughton's 1:35 p.m. call, Jones and Tucker came back to Animal Control at 2:00 p.m. for the purpose of helping Claughton retaliate against Waddle and chill her efforts to publicize Claughton's wrongful actions. As part of that scheme, Claughton had both Jones and Tucker prepare untrue and unsworn handwritten statements at 3:37 p.m. on December 20, 2017.

68.     Moser never in his sworn interrogatory responses or his sworn deposition testimony disclosed other crucial communications he had during the afternoon of December 20 that confirm he was directing the vendetta against Waddle for her audacity to challenge Claughton's decision to return the dog to Jones.

WOODS ROGERS PLC
ATTORNEYS AT LAW

69.     Waddle only learned in a Halifax County FOIA response, provided after Claughton and Moser had answered her interrogatories and given depositions, that Moser had called Halifax County 911 at 1:17 p.m. and spoke for 4 minutes with a woman named "Casey."

70.     In the call to Casey (which was immediately after his initial eight-minute phone call with Claughton and just before his follow-up three and five minute phone calls to Claughton), Moser demonstrated that his conversation with Claughton had involved much more than Claughton and he had disclosed in interrogatory responses and depositions, and further demonstrated that he was far from the "on vacation/out of the loop" as he would later falsely project to the media.

71.     Moser told Casey that Waddle had stolen the dog and he wanted information on her.  He complained that Crystal Yeatts should have arrested Waddle for committing a felony by "taking a man's dog…. The lady refused to give the dog back and Crystal didn't, she didn't arrest her."  He added:

> **So Aundrea got the dog, took the dog to the pound and the owner come get it.  Now she done went over to the pound wanting to show her a\*\* (explicative deleted) because we gave the dog back to the owner. So I told Aundrea to go ahead and get the felony warrant on her.**  Because Crystal is not going to do it.  Because Crystal should have locked her up.  Crystal should have put her in cuffs right there because that's a felony.  (Emphasis added.)

72.     In all his sworn discovery responses and deposition testimony Moser concealed that he had this conversation with Casey in the Sheriff's Office and that he had knowledge of Waddle's critical communication with Claughton.  Yet here he was confirming such knowledge and the intent to seek a felony warrant against Waddle precisely because of her critical communication with Claughton in a conversation with Casey within minutes of Waddle's phone call to Claughton and Claughton's initial text and phone call communications with Moser.

73.     Later in the same conversation with "Casey", Moser added

So Aundrea is going to talk to Crystal and see if Crystal wants to
get the warrant.  If Crystal is not going to do it Aundrea is going to
do it and then I am going to have a talk with Tommy.

74.     Both Claughton and Moser, and even Crystal Yeatts, denied in depositions that there was any discussion about Waddle on the afternoon of December 20, yet Moser informs Casey well before Waddle's arrest that Claughton would be conferring with Yeatts to entice her to seek the warrant, and he would only proceed to seek the warrant if Yeatts would not.  The very fact that Claughton ultimately proceeded to get the warrants, at Moser's direction, confirms that, contrary to Yeatts and his deposition testimony, there were discussions between Claughton and Yeatts on the afternoon of December 20 in which Yeatts indicated she was not going to secure warrants, thereby requiring Claughton to have to do so in keeping with the directions Moser had given him.

75.     Moser would have three additional phone conversations with Casey on the afternoon of December 20, each time discussing whether Claughton had secured the warrants from the magistrate yet.

76.     Moser would begin his fifth call with Casey on the afternoon of December 20 (as noted all five calls previously concealed by Moser in discovery) laughing and stating that

I bet she won't stop and pick up another hunting dog.  She got
charged with stealing the dog and charged with grand larceny on
the collar of the dog…. Felony and one misdemeanor… And now
she is burning up Facebook… Now she is burning up Facebook
saying that, saying that a dog in the road ain't nobody's dog… A
dog in the highway is nobody's dog anybody could pick it up.
That's what she is putting on Facebook.

WOODS ROGERS PLC
ATTORNEYS AT LAW

77.     Moser's gleeful response to the procurement of the arrest warrants is manifest in the recording of his comments. His statement about Waddle's Facebook entry was absolutely false as her only posting that day was the one to Jones when she first encountered the dog in

which she alerted him she was taking the dog to Animal Control because of its debilitated condition and he could meet her there.  Moser's statement confirmed he was already engaged in falsely attributing statements to Waddle she had not made, a practice that would continue.  His statement further showed that he had previously read the exculpatory Facebook posting regarding Waddle's true humane intent to get the neglected dog to Animal Control, and yet proceeded anyway in directing Claughton to secure the arrest warrants in vindication for her criticism, and then to lie about what Waddle had actually posted to one of the first Halifax County employees he talked to after procuring the warrants.

78.    Moser concluded his comments, again with laughter:

> I bet she don't stop pick up no hunting dog, and I know she said
> she was taking it to the pound but the gps shows her turning off
> Mountain Road onto Sinai and then she turns back on Green Folly
> and on up there to Valero.

79.    Moser's last statement confirmed that he had been made aware of Waddle's expressed non-larcenous intent, either through Claughton's phone calls or his review of Waddle's Facebook tag to Jones, but he sought to use her diversion to get gas to intimate to Casey that Waddle intended not to follow through on her expressed intent to take the dog to the pound.  If Moser had been truthful in his interrogatory and deposition testimony, he could not have made any of the statements he communicated to "Casey" on the afternoon of December 20 because that discovery contended he had not been made aware of any facts related to what had transpired.  If Moser was being truthful about Waddle's sole Facebook post, which he admitted to Casey he had already read, he could not have intimated that Waddle was intending to steal a dog just after publishing to the World and Jones that she had encountered the debilitated dog and was taking it to Animal Control.

WOODS ROGERS PLC
ATTORNEYS AT LAW

80.     What is also stark in the recording of Moser's conversation with Casey, beyond the admission of a retaliatory motive and the communication of lies about the events preceding the arrest, is the unreserved humor and relish Moser exhibited in bringing about Waddle's arrest.

81.     The recorded calls to Casey also dramatically rebut Moser's sworn deposition testimony where he explained his calls to the non-emergency dispatch number that day as serving the purpose of acting as an anchor call to hold a weak cell phone signal for transfer to others.  The recording provided by the County makes clear that Moser was calling Casey intentionally not to be transferred to others, but to discuss with her his plans to have Waddle prosecuted.  Moreover not one of the five calls recorded that day reveal any weak cell phone signal whatsoever.  The Casey phone calls (which Waddle would never have known of if Moser's effort to hide the calls through redaction at the time he produced his cell phone records pursuant to Court order had not been so transparent) are but further examples of Moser directing a vendetta against Waddle and making false statements in discovery to try and hide the fact afterwards.

82.     For his part, Claughton would at the end of the day on December 20 modify his written report, drafted for the obvious intent to absolve himself of liability.  He simply stated that he had arranged for Jones and Tucker to come back to Animal Control at 2:00 p.m. on December 20 to prepare their statements.  Nowhere did he have either Jones or Tucker include in their statements what he knew to be true: that he called them back in for statements just after Waddle's 12:59 p.m. phone call, in which she had criticized him and promised public exposure of his actions, and just after he had informed Jones, after receiving instruction from Moser, that he needed the statements to respond to Waddle's threatened effort to have him fired for his actions regarding the dog.

83.    Both Jones's and Tucker's statements, as procured by Claughton, were false.

Jones's statement recited that:

> We was hunting on Mountain Rd. and my dogs was running deer. The dogs was [sic] heading towards the road by what the GPS was saying. So I tried calling my dogs from the road. I was down in the bushes but my dogs usually come by me yelling. Two of my came back to me and I put them on a leash so when I went to track my last dog the dog was head [sic] to South Boston and it was moving real quick [sic] so we followed the way the dog was headed. We pulled up at the store and I asked people do "they have my dog in your [sic] car" and she said "yes I have this poor ass dog in my car." I said how you take my dog and my dog tracking collar it was my name and number on my collar. She locked the doors of her car and said "you not getting shit" and the police showed up and they handled it in a proper manner.

84.    Tucker's statement recited that:

> While deer hunting this morning I was tracking Nick Jones dog which had my garmin #15 collar around his neck up around the church above dodge city. We started heading that way and I noticed had passed me headed towards town. I turned around and tracked the dog back to the Spirit gas station. When we pulled up she refused to give us our property back. I told her that she had my buddy dog with my $300 tracking collar on and that she wasn't leaving until I had it back. She locked the dog in the car instead of returning our property, and caused a scene that should have never made it that far if she would have gave us his dog and my collar.

85.    Claughton knew from the 911 dispatcher communication to him that these statements failed to properly describe what had happened at the gas station. He knew that Waddle's intent was not to steal the dog, but to turn it over to Animal Control as his own written report, prepared at 11:00 a.m. on December 20, before Waddle's 12:59 confrontational call to him, confirmed. He knew that Waddle had almost hit the dog which she observed to be malnourished and that she was on the way to Animal Control when she stopped to get gas. He also knew that she had readily given him the dog upon his arrival consistent with her reported desire to secure Animal Control intervention.

WOODS ROGERS PLC
ATTORNEYS AT LAW

86.     Claughton also knew there was a 911 tape that could have easily been consulted to secure even more objective evidence regarding Waddle's encounter with the dog, her intent to get the dog to Animal Control, and the vile and hostile attacks by Jones and his gang at the gas station before the "law" could arrive.  Claughton, however, made no effort to procure a copy of the 911 tape for review or for production to the magistrate.  For his part, Moser never advised Claughton to engage in even this modicum of a reasonable investigation.

87.     Jones's and Tucker's statements put vulgar words in Waddle's mouth that the 911 call clearly shows were not said.  Their statements intentionally left out the crucial fact which Waddle had made clear— as confirmed on the 911 tape and in her Facebook post to Jones to which he had responded before providing Claughton a written statement— that she was taking the dog to Animal Control because of its obvious physical distress.  Jones and Tucker knew, as did Claughton, that their written statements were false and misleading, intentionally holding back from the magistrate that Waddle had no intent to steal the dog and its tracking collar, but instead was only seeking help for the neglected dog from Animal Control.

88.     Claughton knew of Waddle's humane intent, it having been communicated to him by the 911 dispatcher as he came to the scene (as confirmed on the 911 tape), but he nevertheless orchestrated the crafting of Jones's and Tucker's written statements to make it appear that Waddle's intent was to permanently convert the dog to her ownership.  Claughton's motive, and Moser's who was directing him, was to retaliate against Waddle for her criticism and to chill her prospective free speech rights so as to avoid Claughton's lack of due care regarding the dog becoming public knowledge.  Jones and Tucker, by their participation in Claughton's creation of false charges against Waddle, at Moser's direction, acted as Claughton's and Moser's willing co-conspirators.

WOODS ROGERS PLC
ATTORNEYS AT LAW

89.     In discovery, Moser has confirmed under oath that at the time he instructed Claughton to get statements from the accusers, Jones and Tucker, he was aware that the U.S. Constitution required a reasonable and unbiased investigation before seeking an arrest warrant, and that such investigation included trying to get a statement from the accused.  In fact, he further stated under oath that if Claughton was doing his job right, he would get a statement from the accused as well before pursuing an arrest warrant.  Yet Moser admittedly told Claughton, and Claughton blindly obeyed, to get statements only from the accusers for the purpose of seeking Waddle's arrest.  Moser and Claughton were aware of what an investigation required in order to determine whether proximate cause existed to justify criminal larceny charges, but deliberately proceeded contrary to that obligation because of their mutual intent to retaliate against Waddle for daring to challenge Claughton's action.

90.     For his part, Claughton has admitted that he saw no basis for a larceny charges. When asked in his deposition when Waddle committed theft, he admitted it could not have occurred when Waddle picked up the dog, or when she went to get gas, or even when Jones confronted her at the station.  Instead, for Claughton, there was no theft until the moment the magistrate issued the arrest warrants. Such statement makes vividly clear that for Claughton and Moser, it did not matter what Waddle actually had done; it did not matter that there was no probable cause to justify seeking arrest warrants; it only mattered that they could convince a magistrate, through false representations, to issue the warrants.

91.     Moser and Claughton also admitted in their depositions that neither had ever in their entire careers sought an arrest without conferring with the accused so as to give the accused a chance to give his or her side of the story prior to doing so.  Waddle was the only exception, and the reason for the exception was that the purpose of securing the arrest warrants was not to

21

enforce the law, but to wrongfully use criminal prosecution to punish Waddle for her speech and prevent any further criticisms of Claughton's actions.

92.  After securing the unsworn misleading statements from Jones and Tucker, Claughton sought arrest warrants from the local state court magistrate.  Claughton presented the two statements to the magistrate, and after being put under oath told the magistrate that the statements in the two statements were true.  Claughton, however, could have no personal knowledge to swear that what Jones and Tucker were describing were true or not as he was not present for most of what was described.  But beyond that lack of knowledge, Claughton possessed substantial personal knowledge from communications with the 911 dispatcher and his late arriving presence on the site that rendered the two statements he was proffering to support the larceny charges false.  Yet he proceeded to vouch under oath for the truth of such statements anyway because his and his co-conspirators' intent was not to initiate the proper use of the criminal process, but instead to misuse such process to punish and silence a critic of Jones's treatment of his dog and Claughton's wrongful assistance in that effort.

93.  Claughton admittedly also did not disclose to the magistrate that Waddle had acted in compliance with Virginia Code § 3.2-6551 by attempting to contact the owner of the dog, a "companion animal", and Animal Control.  He also did not disclose to the magistrate that this very statute vested Waddle with authority for at least 48 hours to secure adequate feed, shelter, care, treatment, and transportation for the dog, and that Waddle was precisely exercising that authority in trying to get the dog to Animal Control for protection at the time of her confrontation with Jones and his gang at the station.  Had Claughton disclosed the protection conferred by this statute to the magistrate, she would have had no grounds to issue any arrest warrants.

WOODS ROGERS PLC
ATTORNEYS AT LAW

94.     Based on Claughton's sworn testimony that the unsworn Jones and Tucker statements were true, the magistrate issued two arrest warrants at 4:23 p.m. on December 20, 2017.  The charges Claughton secured were violation of Virginia Code § 18.2-95 (felony larceny for "taking" the tracking collar on the dog), and Virginia Code § 18.2-96 (misdemeanor larceny for "taking" the dog).  Claughton did so with full knowledge that Waddle had not taken the dog with the intent to steal, as required by law for a larceny charge, but instead had done so for the purpose of securing the protection of Animal Control for the dog's well-being, given that it was clear that Jones had demonstrated a lack of any commitment to care properly for the dog.

95.     Claughton also knew from his training that the magistrate had not even issued the proper criminal charge for the alleged theft of a dog.  That criminal act is covered by Virginia Code § 18.2-97, a felony, and not Virginia Code § 18.2-96, which applies to petit larceny.  But given the goal was to get arrests warrants for retaliation and speech suppression purposes, whether the magistrate even applied the right statute or not was immaterial.

96.     There was absolutely no probable cause to initiate larceny charges against Waddle as Claughton, Moser, Jones, and Tucker knew.  Claughton and Moser knew that Claughton would be able to convince the magistrate to issue larceny arrest warrants only by withholding material facts, as to Waddle's innocent and humane intent to take the dog to Animal Control for care and protection, so as to create the false impression that Waddle's intent was to acquire permanent ownership of the dog and tracking collar through theft.  Claughton knew that if he disclosed to the magistrate that his and Moser's maliciously inspired motivation in seeking the arrest warrants was to retaliate against Waddle for her criticism of Claughton's conduct and to chill her future free speech rights, no warrant would be issued.  Claughton's and Moser's

WOODS ROGERS PLC
ATTORNEYS AT LAW

knowledge precluded them from possessing any reasonable basis to conclude that probable cause

existed that Waddle had committed larceny so as to approach the magistrate in the first place.

97.     On December 21, 2017, Claughton accompanied Jones and Tucker to the

Loveshop Road Veterinary Clinic run by William W. Will, DVM.  The intake person at the

clinic observed that the dog was very sick, could not stand, and appeared to be suffering from

seizures.  Dr. Will would later describe to a newspaper reporter that he had observed emaciation,

seizures, convulsions, and "chewing gum fits" consistent with distemper.  He told Jones that

nothing could be done for the dog, given its abject condition.  Jones authorized euthanasia, which

was administered that day.

98.     Claughton, who had accompanied Jones and Tucker to the Dr. Will's office, was

made aware on December 21 that the dog had been euthanized because of its deplorable physical

condition.  Yet neither he, nor Moser, his superior, made public that outcome, which would have

fully exonerated Waddle in the public's eyes and verified not only Jones's mistreatment, but

Claughton's initial disregard of the dog's well-being.

99.     Despite this outcome, Claughton, with Moser's knowing authorization, was not

going to be deterred in the retaliatory campaign to punish Waddle for her critical speech and to

dissuade her from airing any such speech publicly.  Although he now had absolute proof of the

lack of proper care of the dog and the bona fides of Waddle's humane effort to secure

intervention for the dog before it was too late, Claughton, and his superior Moser, did nothing to

see that the now pending criminal proceeding, based on the improperly issued arrest warrants,

was dismissed.

100.     The true intent of Claughton's and Moser's decision to wrongfully prosecute

Waddle criminally is further confirmed by their contrary treatment of Jones. At 11:00 a.m. on

December 20, 2017, they had evidence that Jones had mistreated his dog by not securing vet care

in violation of Virginia's animal cruelty statute, Virginia Code 3.2-6570.  It was also obvious

that he had not secured a proper license for the dog as required by law.  They also knew that

there were other dogs in Jones's custody that may be suffering from similar neglect.  Yet while

they immediately orchestrated criminal charges against Waddle, they took no action against

Jones.  Moser would only himself initiate criminal prosecution against Jones after the charges

against Waddle were nolle prosssed on January 3, 2018.

      101.    Even with knowledge on December 21 that the dog had been euthanized for

highly contagious distemper, which could be affecting Jones's other dogs, neither Claughton nor

Moser still took any action against Jones for the purpose of protecting his other dogs.

Considerations for animal well-being was a remote consideration for these animal control

officers.  Controlling the speech of a critic, through swift retaliation, was all that was driving

them on December 20 or thereafter.

      102.    On December 26, literally the day after Christmas, the Halifax County Sheriff's

Office served the arrest warrants on Waddle.  She was booked, a mug shot taken, and finally

released on a $1,500 unsecured bond with instructions to appear for arraignment on January 3,

2018, and not to leave the State pending the outcome of the criminal proceeding.  Her arrest and

charges became the topic of various broadcast and print media news stories as the media began

to cover her prosecution (or more appropriately described, persecution).

      103.    Between her arrest on December 26, and her arraignment on January 3, 2018,

Waddle spoke to the press and posted to social media a number of statements in support of her

actions on December 20 and her innocence of the charged crimes.  But at least in this vulnerable

period, Claughton's and Moser's strategy worked.  Waddle withheld public criticism of

Claughton's wrongful action in returning the debilitated dog to Jones.

104.    On December 27, Moser contacted the Commonwealth Attorney to discuss the

Waddle matter.  In his interrogatory answers and deposition testimony, he concealed that this

communication had occurred, stating under oath that his only two conversations with the

Commonwealth Attorney were in January just prior to the arraignment.

105.    In that December 27 conversation, which the Commonwealth Attorney in her

deposition described from her notes of the phone call, Moser provided a version of what

happened on December 20 that was false. Moreover, it included allegations of fact that if

Moser's statements in his interrogatory answers and deposition testimony were true, he could

have not secured from Claughton during their cryptic single eight-minute call on December 20.

The false statements could have only come from Moser's effort to continue Waddle's wrongful

prosecution through his own made-up narrative of the events of December 20.

106.    In that false narrative, Moser told the Commonwealth Attorney that Waddle had

seen the dog and loaded it in her car. Moser omits the motive for that decision: to get the dog to

Animal Control.  Moser then states that the Owner tracked her with the dog and then confronted

her.  Her response was he could "kiss her [explicative deleted]" and then sought to escape the

confrontation, but "they would not let her." Again, these statements were untrue as Waddle made

no such statement and never sought to leave the gas station where the confrontation occurred.

To the contrary, she was the one who had called the police and Animal Control to come to the

site in her 911 call, a fact that Moser also withheld from the Commonwealth Attorney.

107.    Moser then told the Commonwealth Attorney that the arriving deputy told

Waddle to return the dog, but Waddle refused.  Again, Moser's narrative was false as the deputy

WOODS ROGERS PLC
ATTORNEYS AT LAW

never made such a demand on Waddle and there were certainly no refusal.  Moser then told the

Commonwealth Attorney that Waddle refused to return the dog to the owner even when

Claughton insisted she do so.  Again this statement was false as Claughton admittedly never

directed Waddle to do any such thing, and Claughton's own written statement confirmed that she

had willingly yielded the dog to him upon his arrival (consistent with her request to the 911

dispatcher that an animal control officer come to the station).  All of Moser's false statements

were intended to create the impression that Waddle had an intent to steal the dog, instead of, as

was the case, get the neglected dog to Animal Control, a purpose that Moser completely

excluded from his narrative.

108.    But Moser went further in his disclosure to the Commonwealth Attorney than

create a false narrative to justify criminal prosecution.  He also said enough to show that his

conversation with Claughton on December 20 could not have been as cryptic as described in his

interrogatory answers and deposition testimony.  He told the Commonwealth Attorney that he

was aware that Waddle claimed to have called Animal Control.  He also relayed that Waddle had

passed the turnoff for Animal Control and continued on away from her home and the shelter, a

partially true statement as Waddle had admitted from the outset on the 911 tape that she had

traveled to the gas station for the obvious need to refuel an almost empty gas tank before

continuing to Animal Control.  Moser's version regarding Waddle's journey, which left out the

fact that she was at the station to get needed gas, was intended to create the false impression that

Waddle was in flight with the dog at the time she was confronted at the station.

109.    Moser opined to the Commonwealth Attorney that the facts he had related

confirmed an intent to steal.  Moser left out of his statement the crucial facts that would have

rebutted any intent to steal, including what Claughton had been told by the 911 dispatcher

27

regarding Waddle's actual purpose to get the dog to Animal Control for protection from Jones's neglect, and the facts that confirmed that intent, including her efforts to contact Jones and Animal Control, and her clear expression of intent as first communicated to Jones by Facebook post prior to the gas station confrontation and then to the dispatcher in the 911 call from the station.   Moser had admitted to "Casey" on December 20 that he was aware of Waddle's Facebook post to Jones, but never communicated to the Commonwealth Attorney that the post made absolutely clear that Waddle's sole intent was to get the neglected dog to Animal Control as she had announced to Jones and the World before she started her journey.

110.    Moser's fabrications, however, did not stop with the Commonwealth Attorney. When contacted by a news reporter Moser fashioned a false impression that he was not involved in Waddle's wrongful arrest because he was out of the loop on vacation.  When asked about the charges against Waddle, Moser offered no explanation, and said that there would be "plenty of time" after he returned from vacation to sit down the Claughton to discuss the matter.  He added that he trusted his officers and would not second guess them.  This "out of the loop but I trust my subordinate's actions in my absence" statement was false as Moser had been directly involved in the decision to wrongfully prosecute Waddle, and, in fact, had directed Claughton to do so.  It would take Verizon records and 911 recordings to confirm just how intimately involved Moser had been from the outset in punishing Waddle for her criticism of Claughton's actions.

111.    When the reporter asked Moser why he had not disclosed to the reporter in a prior conversation that the dog had been euthanized, Moser responded that "it was not something I felt you needed to know," which was but another way of saying that such a crucial fact was something Moser did not want the public to know.

112.    Moser then incredibly told the reporter that Dr. Will should not have disclosed to the media what he had learned in his examination of the dog and the fact of the decision to euthanatize.  Moser told the reporter that he was going to report Dr. Will to the appropriate state authorities, an apparent misimpression that animal records were covered by the confidentiality provisions in HIPAA, which actually only govern the medical records of persons.

113.    Moser's statement to the reporter clearly demonstrated that he was fully on board with keeping from the public the basic facts of the dog's mistreatment, which, if made public, would so undercut Claughton's (and his) wrongful actions.

114.    Moser's fabrications to the press, however, went even further.  Waddle had told a press reporter that when she had called Claughton about returning the dog to Jones, Claughton had justified the decision on the fact that the dog was "part of a hunting pack."  Moser outright denied Waddle's version of her conversation with Claughton to the reporter.  But if Moser had been telling the truth in his interrogatory answers and his deposition testimony about his cryptic communications with Claughton regarding Waddle on December 20, Moser would have no facts to admit or deny the statement because he would have no knowledge from Claughton about what Claughton had said to Waddle.  Moser illogically sought to get around this glaring contradiction in his deposition by stating that his outright "Claughton never said it" denial to the reporter was meant to convey "I don't know if he said it or not."

115.    Waddle had also told a reporter that when Claughton arrived at the gas station he said that the dog looked starved and emaciated, and for that reason he was taking the dog.  Moser likewise denied to the reporter that Claughton had made this statement to Waddle.  Again, Moser was not present, and if his interrogatory answers and deposition testimony were true about his single, limited call with Claughton, he could have learned no facts to permit a denial.  And again

when confronted with this contradiction in his deposition, he sought to convert his prior outright "Claughton never said it" denial to the reporter to an "I don't know if he said it or not."

116.    Moser had been engaged in a campaign with the press and the Commonwealth Attorney to defend Claughton's wrongful actions (which he had directed) and to indict Waddle through false statements including his false "vacationing/stand by his subordinate" narrative, which falsely described him out of the loop as opposed to the actual directing role he was playing behind the scenes to retaliate against Waddle.

117.    Waddle was rightfully distressed by Claughton's retaliation, to which Jones and Tucker contributed, and which (she would only learn in this action) Moser directed.  Being then unemployed with two children to care for, and lacking any funds to pay for a legal defense, Waddle unsuccessfully tried to raise donations to pay for a lawyer to represent her in the criminal proceeding. When that effort failed, she also unsuccessfully tried to find a lawyer who would help her pro bono.

118.    The possible penalties that were associated with the false charges Claughton had falsely and intentionally manufactured, with Jones' and Tucker's help, and at Moser's direction, consisted of up to 20 years of incarceration for Waddle in a state correctional facility for the felony charge, and up to one year of incarceration for Waddle in such facility for the misdemeanor charge. Both charges also exposed Waddle to a possible $2,500 fine, which she could ill afford.

119.    Waddle was naturally to experience substantial emotional distress, embarrassment, and uncertainty as she faced the prospect of criminal punishment without any means to retain a lawyer to fight the charges.  She was also understandably in a state of Kafkaesque disbelief that someone who was only trying to help a neglected animal gain

WOODS ROGERS PLC
ATTORNEYS AT LAW

protection from public officials— who had a duty to provide such protection— was now to be imprisoned for that noble effort based on the malicious persecution by those very public officials.

120.    Claughton's and Moser's ploy worked in one sense.  It caused Waddle to withhold further public criticism of Claughton's actions now that the reality of criminal prosecutions, and the threat of criminal conviction and imprisonment, were real. Any similarly situated person of ordinary firmness reasonably would have been similarly chilled in the exercise of his or her First Amendment rights by the conduct Claughton undertook through his retaliatory prosecution, at Moser's direction, in response to criticism and the threat of public exposure.  But for Waddle's criticism and threat to go public on a matter of public concern, Claughton and Moser would not have wrongfully orchestrated the larceny prosecution through procurement of the arrest warrants knowingly based on misleading and incomplete factual allegations.

121.    Claughton and Moser did nothing to see that this threat of punishment was withdrawn prior to the arraignment on January 3, 2018.  Both would have known that Waddle could not be legitimately charged with larceny given that she had not assumed custody of the dog when it climbed in her car with the intent to steal the dog, as the law required for larceny conviction.  Both Claughton and Moser knew that Waddle was simply engaged in the humane effort to get the dog to Animal Control for its personnel to see that the dog was properly cared for.  Both knew that there was no probable cause of a crime to justify the continued prosecution on the larceny charges.  Yet they did nothing to see that those bogus charges were withdrawn or dismissed.

WOODS ROGERS PLC
ATTORNEYS AT LAW

122.    On January 3, 2018, Waddle appeared at the arraignment pro se, not having been able to secure legal counsel.  She had no idea as to what would be done to her as she was now

caught in serious criminal proceedings without the capacity to defend herself.  At the arraignment, the Commonwealth Attorney announced to the Court the entry of nolle prosequi, as she had decided not to prosecute the pending charges further.  Based on Commonwealth Attorney's statement, the Court dismissed the proceeding.

123.    After the arraignment, the Commonwealth Attorney issued a public statement confirming the obvious: once she was made aware of the facts, it was clear that "the evidence did not indicate criminal intent as required by law."  What Martin left unexplained is why Moser and Claughton had not approached her to secure an earlier dismissal of the charges before January 3 given the obvious defect in their issuance. The only obvious explanation is that the purpose of the charges was to chill Waddle's First Amendment rights of free speech and to retaliate against her for threatening to make Claughton's conduct public.

124.    Claughton's use of criminal prosecution to retaliate against Waddle's expressed commitment to publicize his wrongdoing, which Moser had directed and permitted to continue, effectively precluded Waddle from pursuing the public campaign she had committed to.  Her free speech rights had now been conclusively chilled.  All her speech efforts after her arrest had to be devoted to simply avoiding prison.

125.    On January 3, 2018, Moser spoke before a TV camera with a reporter for WSLS TV out of Roanoke Virginia.  Instead of acknowledging the wrongful nature of Claughton's actions, and extending an apology to Waddle for the nightmare Claughton, with Moser's support, had wrongfully caused, Moser in the broadcast portion of the interview stated that "Animal Control stands by the decision of what **we did**," (emphasis added), and that "I stand behind the officer that was involved in the incident."  Not in the broadcasted portion of the interview, but still reported by the reporter during the broadcast, was Moser's additional statement that "when

Waddle refused to give the dog back to the Owner, when the Owner confronted her on the way to take the dog to Animal Control, that constituted theft."  Moser made this public statement accusing Waddle of theft despite the fact that the Commonwealth Attorney had just nolle prossed the larceny charges precisely because Waddle's actions did not constitute a violation of any law, and certainly not theft.

126.    Omitted from Moser's public statement accusing Waddle of theft was the false statements he had made to the Commonwealth Attorney in his December 27 phone call, which he invented to provide fictional support for an intent to steal.  Gone were his prior allegations that Waddle was actually not seeking to transport the dog to Animal Control, that when confronted by the owner she sought to drive off from the station, and that she had refused to return the dog to the owner when directed to by both the arriving police officer and Claughton. Unable to continue that false narrative, initially given to the Commonwealth Attorney, Moser's version of criminality was now based on Waddle's mere refusal to return the dog when the owner demanded it, despite the fact that her clear purpose was not theft, but protection for a neglected dog through the intervention of Animal Control.

127.    Moser made his false defamation per se allegation in the presence of the broadcast reporter who had just interviewed him out of malice and made the statement public for the sole purpose of damaging Waddle's reputation by branding her a thief, rather than the humane rescuer of a mistreated dog that should have been taken into protective custody by Animal Control.

128.    Moser, previously behind the scenes and now publicly, was still engaged in an effort to chill Waddle's free speech rights now through defamation, given the loss of the criminal hammer previously employed, but rightfully withdrawn by the Commonwealth Attorney.  Moser

WOODS ROGERS PLC
ATTORNEYS AT LAW

33

knew that Waddle had committed no theft, but nonetheless intentionally made his knowingly false allegation public in order to undercut Waddle's reputation and community standing.

129.    Moser not only maliciously defamed Waddle with his public statement, he also misled the public by hiding the fact that his "stand behind" comment was false.  He had not stood behind Claughton's independent action.  He had from the very outset led the charge for the sole purpose of retaliating against Waddle for the intended exercise of her First Amendment rights, and to chill the exercise of those rights.

130.    On January 3, 2018, after public exposure of Claughton's wrongful conduct had become intense through media coverage of the criminal proceedings against Waddle, Claughton finally and belatedly prepared an incident report regarding Jones's wrongful neglect of his now-deceased dog.  Claughton recommended charges be brought against Jones for violation of Virginia Code § 3.2-6503 ("failure to provide veterinary care when needed to prevent suffering or disease transmission" and "failure to provide adequate shelter"); County Ordinance § 5-71 (lack of county tags on three dogs); and County Ordinance § 5-106 (lack of rabies vaccinations for three dogs).  On January 8, 2018, Moser belatedly authorized the charges be filed against Jones.

131.    Jones was ultimately convicted of violation of Virginia Code § 3.2-6503 for his mistreatment of the dog Waddle had befriended, but not of the other charges because Claughton testified at his trial that Jones had cured those violations.

132.    Claughton would later seek justification for his wrongful conduct by contacting his former animal control instructor, Kathy Strouse.  Strouse has been an animal control officer of statewide reputation who has taught for years at the academy where animal control officers from around the state secure their training on proper professional conduct.  Consistent with his

WOODS ROGERS PLC
ATTORNEYS AT LAW

prior communication with the magistrate, he withheld from Strouse the central facts about Waddle's true intent on December 20 in order to create the false impression that Waddle had taken the dog with the intent to steal the dog and the collar. Strouse's expressed support for Claughton's action in seeking the arrest warrants was predicated on his false narrative. She would never have expressed such support had he described for her the actual facts, which demonstrated that there was no probable cause that larceny had been committed, as Claughton knew from his training he needed to establish before seeking any arrest warrant.

133.    All of the actions described above by Claughton and Moser were taken under color of state law. All actions by Jones and Tucker related to the procurement of the meritless arrest warrants, based on their false statements, were performed to assist Claughton and Moser orchestrate their vendetta against Waddle for daring to criticize Claughton and express the intent of going public with her criticism.

134.    Once freed from the threat of criminal prosecution, Waddle was also free from the chill on the speech she intended to communicate to the "highest authority" critical of Claughton's and by extension Animal Control's wrongful conduct regarding the dog Waddle had befriended. Her first act of free critical speech after dismissal of the criminal charges was to approach Moser at his office with her criticism on January 3 (not knowing at the time that he was the actual instigator of the criminal charges against her through his concealed instructions to Claughton). Waddle also thereafter communicated her critical opinion about how the Halifax County Animal Control had responded to her, to the dog she befriended, and to Jones to the Commonwealth of Virginia's Office of Animal Care & Emergency Responses in the hope that it would undertake its own investigation of these issues.

WOODS ROGERS PLC
ATTORNEYS AT LAW

<u>COUNT ONE: SECTION 1983 CLAIM AGAINST CLAUGHTON AND MOSER FOR
VIOLATION OF WADDLE'S FIRST AMENDMENT RIGHTS</u>

135.    Waddle incorporates by reference the allegations in Paragraphs 1-134 as her

allegations in this Paragraph.

136.    Claughton's seeking arrests warrants, at Moser's direction, based on knowingly

false information, for the intended purposes of retaliating against Waddle for her criticism and to

chill her prospective free speech rights on a matter of public concern, violated Waddle's right to

free speech under the First Amendment to the United States Constitution.

137.    Claughton and Moser pursued the wrongful criminal prosecution with malice and

in callous disregard of Waddle's free speech rights. As a result of Waddle's criticism of his

conduct and her threat to report Claughton to the highest authority, Claughton and Moser

harbored ill will and spite toward Waddle which motivated their decision to initiate larceny

charges against Waddle, which they knew were not factually justified. Claughton and Moser

elected to use the criminal prosecution process for an improper purpose.

138.    Claughton and Moser knew at the time they initiated the wrongful prosecution

that their action would violate Waddle's First Amendment rights.  Their wrongful conduct

violated clearly established constitutional rights not only within their knowledge but the

knowledge of any reasonable law enforcement officer, including an animal control officer.

139.    Claughton's and Moser's actions caused Waddle great emotional distress,

embarrassment, and uncertainty as she faced the prosecutorial power of the State virtually alone

with the prospect of criminal conviction and imprisonment immediately before her.

140.    No citizen of the United States of America should be subjected to such retaliatory

abuse as Claughton and Moser engaged in under color of state law.

141.     Waddle is accorded a right to recover compensatory and punitive damages from Claughton and Moser for their intentional and maliciously inspired First Amendment violation pursuant to 42 U.S.C. § 1983.

142.     Upon an affirmative judgment under this Count, Waddle shall also be entitled as the "prevailing party" to recover attorneys' fees for the legal services provided in the successful prosecution of this Count, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against defendants Aundrea Claughton and Todd Moser, jointly and severally, for compensatory damages in the amount of $750,000, punitive damages in the amount of $350,000, and reasonable attorneys' fees for the legal services provided in the successful prosecution of this claim.

## COUNT TWO:  SECTION 1983 CONSPIRACY CLAIM AGAINST CLAUGHTON, MOSER, JONES, AND TUCKER FOR VIOLATION OF WADDLE'S FIRST AMENDMENT RIGHTS

143.     Waddle incorporates by reference the allegations in Paragraphs 1-142 as her allegations in this Paragraph.

144.     Jones and Tucker had no intention to initiate any criminal charges against Waddle until after Waddle had criticized Claughton for his disregard of his animal control duties and threatened to make such wrongdoing public. But Jones and Tucker then agreed to assist Claughton, at Moser's direction, initiate criminal charges against Waddle based on their false and misleading written statements in order to retaliate against Waddle and suppress her speech rights.

145.     Jones and Tucker knowingly conspired with Claughton, who was acting at Moser's direction, to violate Waddle's First Amendment rights.

146.    Jones's and Tucker's participation in a conspiracy, with co-conspirators acting under color of state law, renders them jointly and severally liable with Claughton and Moser, pursuant to 42 U.S.C. § 1983.

147.    Jones's and Tucker's conspiratorial actions with Claughton and Moser caused Waddle great emotional distress, embarrassment, and uncertainty as she faced the prosecutorial power of the State virtually alone with the prospect of criminal conviction and imprisonment immediately before her.

148.    No citizen of the United States of America should be subjected to such retaliatory abuse as Claughton and Moser, engaged in, in conspiracy with Jones and Tucker, under color of state law.

149.    Upon an affirmative judgment under this Count, Waddle shall also be entitled as the "prevailing party" to the recovery of attorneys' fees for legal services provided in the successful prosecution of this Count, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Aundrea Claughton, Todd Moser, Nicholas D. Jones, and Dre D. Tucker, jointly and severally, for compensatory damages in the amount of $750,000, punitive damages in the amount of $350,000, and reasonable attorneys' fees for the legal services provided in the successful prosecution of this claim.

## COUNT THREE:  SECTION 1983 CLAIM AGAINST CLAUGHTON AND MOSER FOR VIOLATION OF WADDLE'S FOURTH AMENDMENT RIGHTS

150.    Waddle incorporates by reference her allegations in Paragraphs 1-149 as her allegations in this paragraph.

WOODS ROGERS PLC
ATTORNEYS AT LAW

151.    Claughton and Moser sought the larceny arrest warrants against Waddle with malice and without probable cause.  They did so as a result of personal spite and ill will

38

generated by her criticism of Claughton's performance and her threat to go public with her criticism through the exercise of her free speech rights under the First Amendment.

152.    Both Claughton and Moser knew they lacked probable cause to secure the larceny arrest warrants, and that Claughton had not undertaken an appropriate investigation, including interviewing the person they sought to accuse and procuring the 911 tape, prior to seeking the arrest warrants.

153.    Claughton's actions, at Moser's direction, in securing the arrest warrants which led to Waddle's arrest, criminal processing, restrictions on travel, and mandatory attendance at a criminal proceeding constituted an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

154.    Claughton's actions, at Moser's direction, caused Waddle great emotional distress, embarrassment, and uncertainty as she faced the prosecutorial power of the State virtually alone with the prospect of criminal conviction and imprisonment immediately before her.

155.    No citizen of the United States of America should be subjected to such retaliatory abuse as Claughton and Moser engaged in under color of state law.

156.    Waddle is entitled to recover compensatory and punitive damages from Claughton and Moser for the violation of her Fourth Amendment rights pursuant to 42 U.S.C. § 1983.

157.    Upon an affirmative judgment under this Count, Waddle shall also be entitled as the "prevailing party" to the recovery of attorneys' fees for the legal services provided in the successful prosecution of this Count, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Aundrea Claughton and Todd Moser, jointly and severally, for compensatory damages in the amount of

$750,000, punitive damages in the amount of $350,000, and reasonable attorneys' fees incurred in the successful prosecution of this claim.

### COUNT FOUR: SECTION 1983 CONSPIRACY CLAIM AGAINST CLAUGHTON, MOSER, JONES, AND TUCKER FOR VIOLATION OF WADDLE'S FOURTH AMENDMENT RIGHTS

158.    Waddle incorporates by reference the allegations in Paragraphs 1-157 as her allegations in this paragraph.

159.    Just as Jones and Tucker conspired with Claughton and Moser to violate Waddle's First Amendment rights, they also conspired with Claughton and Moser to violate Waddle's Fourth Amendment rights to be free from an unreasonable seizure through their solicited assistance in the wrongful securing of the arrest warrants.

160.    Claughton's actions, at Moser's direction, in conspiracy with Jones and Tucker, caused Waddle great emotional distress, embarrassment, and uncertainty as she faced the prosecutorial power of the State virtually alone with the prospect of criminal conviction and imprisonment immediately before her.

161.    No citizen of the United States of America should be subjected to such retaliatory abuse as Claughton engaged in, in conspiracy with Jones and Tucker, under color of state law.

162.    Waddle is entitled to recover compensatory and punitive damages from Claughton, Moser, Jones, and Tucker, jointly and severally, for the violation of her Fourth Amendment rights, through their conspiracy, pursuant to 42 U.S.C. § 1983.

163.    Upon an affirmative judgment under this Count, Waddle shall also be entitled as the "prevailing party" to the recovery of attorneys' fees for the legal services provided in the successful prosecution of this Count, pursuant to 42 U.S.C. § 1988.

Woods Rogers PLC
ATTORNEYS AT LAW

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Aundrea Claughton, Todd Moser, Nicholas D. Jones, and Dre D. Tucker, jointly and severally, for compensatory damages in the amount of $750,000, punitive damages in the amount of $350,000, and reasonable attorneys' fees for the legal services provided in the successful prosecution of this Count.

<u>COUNT FIVE: STATE LAW MALICOUS PROSECUTION AND PUNITIVE DAMAGE CLAIM AGAINST CLAUGHTON AND MOSER</u>

164.   Waddle incorporates by reference the allegations in Paragraphs 1-163 as her allegations in this paragraph.

165.   Claughton's and Moser's intentional and knowing orchestration of the issuance of arrest warrants was not based on probable cause, but instead constituted a maliciously inspired retaliation for Waddle's criticism of Claughton's wrongful action in returning the dog to its inhumane owner and her threat to go public about such action.  No reasonable animal control officer could have reached the belief that Waddle's effort to take the dog to Animal Control for care and protection constituted the crime of larceny.  Claughton and Moser knew of Waddle's actual intent, but Claughton, at Moser's direction, nevertheless communicated false and misleading statements to the magistrate to effectuate issuance of the warrants constitute.

166.   Claughton's and Moser's wrongful prosecutorial actions, as animal control officials with the power to procure arrest warrants, constituted malicious prosecution under Virginia law.

167.   The criminal prosecution that Claughton wrongfully initiated, at Moser's direction, was terminated in a manner favorable to Waddle when the case was nolle prossed by the Commonwealth Attorney.

WOODS ROGERS PLC
ATTORNEYS AT LAW

168.    The record of the criminal prosecution remains part of Waddle's record because she lacks the financial capacity to initiate expungement proceedings pursuant to Virginia law.

169.    Claughton's actions, at Moser's direction, caused Waddle great emotional distress, embarrassment, and uncertainty as she faced the prosecutorial power of the State virtually alone with the prospect of criminal conviction and imprisonment immediately before her.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Aundrea Claughton and Todd Moser, jointly and severally for compensatory damages in the amount of $750,000 and punitive damages in the amount of $350,000.

## COUNT SIX:  STATE LAW CONSPIRACY CLAIM AGAINST CLAUGHTON, MOSER, JONES, AND TUCKER

170.    Waddle incorporates the allegations in Paragraphs 1-169 as her allegations in this paragraph.

171.    Claughton, Moser, Jones, and Tucker's joint action intended to result in the arrest and criminal prosecution of Waddle for larceny, based on false and misleading factual allegations presented to the magistrate to secure the arrest warrants, constituted a conspiracy for the purpose of engaging in malicious prosecution.

172.    Both Jones and Tucker, like Claughton and Moser, knew that there were no facts to support the proposition that Waddle had taken the dog and collar for the purpose of assuming permanent ownership thereof.  Both Jones and Tucker lacked any reasonable basis to assist Claughton and Moser, through their execution of their misleading written statements, so as to maliciously injure Waddle through a wrongfully initiated larceny criminal prosecution.

173.    Jones's and Tucker's actions, in conspiracy with Claughton and Moser, caused Waddle great emotional distress, embarrassment, and uncertainty as she faced the prosecutorial

WOODS ROGERS PLC
ATTORNEYS AT LAW

power of the State virtually alone with the prospect of criminal conviction and imprisonment immediately before her.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Aundrea Claughton, Todd Moser, Nicholas D. Jones, and Dre D. Tucker, jointly and severally, for compensatory damages in the amount of $750,000 and punitive damages in the amount of $350,000.

<u>COUNT SEVEN: STATE LAW DEFAMATION CLAIM AGAINST MOSER</u>

174.    Waddle incorporates by reference the allegations in Paragraphs 1-173 as her allegations in this Paragraph.

175.    Moser's public statement, made to a TV news reporter he knew would be broadcasting his statements, which accused Waddle of theft and was made even after the Commonwealth Attorney had acknowledged that there was no evidence to support the larceny prosecutions and effectuated their dismissal, was false and maliciously advanced for the purpose of damaging Waddle's reputation, and nullifying the effectiveness of Waddle's free speech rights through his defamatory characterization of her as a thief.

176.    Moser's statement was untrue, made at a time when Moser knew it was untrue, and constituted defamation per se.  The statement was also a matter of public concern in that it falsely and maliciously accused a citizen of engaging in theft in a context where Moser knew it would be heard by the public.

177.    Moser's actions caused Waddle great emotional distress and embarrassment as she now saw that even the dismissal of the criminal prosecution was not going to stop the persecution that Claughton had started and Moser was continuing.

WOODS ROGERS PLC
ATTORNEYS AT LAW

178.    Moser's false allegation of theft knowingly made gives rise to Waddle's right to presumed, compensatory, and punitive damages.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Todd Moser for the presumed damages the jury will set, or alternatively $750,000 in compensatory damages, plus $350,000 in punitive damages.

COUNT EIGHT:  STATE LAW FIGHTING WORDS CLAIM AGAINST MOSER

179.    Waddle incorporates by reference the allegations in Paragraphs 1-178 as her allegations in this Paragraph.

180.    Moser's maliciously inspired and knowingly false accusation of theft made to a TV news reporter for broadcast to the public, and Waddle, constituted the communication of "fighting word" in violation of Virginia Code § 8.01-45.  To accuse someone of theft publicly is to create the prospect for a breach of the peace that the "fighting words" statute is intended to avoid by providing a cause of action alternative to violent physical retaliation.

181.    Moser made such statement to the news media knowing that Waddle had not committed theft and that his statements would cause her further emotional distress, embarrassment, and anger.

WHEREFORE, Plaintiff Christen Waddle moves the Court for judgment against Todd Moser for the presumed damages the jury will set, or alternatively $750,000 in compensatory damages, plus $350,000 in punitive damages.

Plaintiff Christen Waddle demands a jury trial on all Counts asserted.

CHRISTEN WADDLE

By     /s/ D. Stan Barnhill
                    Of Counsel

WOODS ROGERS PLC
ATTORNEYS AT LAW

44

D. Stan Barnhill (VSB#22978)
Woods Rogers PLC
10 South Jefferson Street, Suite 1400
Wells Fargo Tower
P. O. Box 14125
Roanoke, VA  24038-4125
Telephone: 540/983-7667
Facsimile:  540/983-7711
barnhill@woodsrogers.com

Counsel for Plaintiff Christen Waddle

CERTIFICATE OF MAILING

I, D. Stan Barnhill, hereby certify that on October 30, 2018, the foregoing was filed electronically with the Court through the CM/ECF system, which will electronically send a copy to James A. L. Daniel, Daniel, Medley & Kirby, P.C., P. O. Box 1192, Martinsville, VA 24114, counsel for Defendants Aundrea Claughton and Todd Moser, and was mailed to Nicholas D. Jones, 1074 Pine Height Trail, Halifax, VA  24558, and to Dre D. Tucker, 1066 River Road, South Boston, VA  24592.

_____ /s/ D. Stan Barnhill_____

WOODS ROGERS PLC
ATTORNEYS AT LAW